We're going to wait just a minute until the courtroom is all settled down. Next, we have United States v. Smith and DeLancey. Unshu Bhadrani Good morning. May it please the Court, Unshu Bhadrani, Assistant Federal Public Defender for Appellant Richard DeLancey, and I will be discussing the witness unavailability issue. This Court should vacate appellant's convictions and remand for a new trial because the government failed to demonstrate that Ms. Vixima was unavailable to testify at trial. Prosecutors in this case began their search for Ms. Vixima in earnest five days before trial on April 12th, which was the day of the calendar call. They reached out to her former attorney, Dave Rabin, who was able to then get in contact with Ms. Vixima, he expressed, through contacting a family member of hers. And then through a series of communications, he then communicated to the prosecutors in this case that he was able to determine that she was in Delaware, that she was living with her boyfriend, Florestolf Wiggins, and he also provided prosecutors with her boyfriend's phone number. He also, in another email to prosecutors, noted that he believed, after speaking with her, that he believed that she would cooperate with the prosecution in their prosecution of this case, and he sent another email indicating that he was willing to help in any way that he could further if the prosecutors so required his assistance. But nothing in this record indicates that the prosecutors followed up in any way on the information that Ms. Vixima's former attorney provided them with as to her whereabouts, nor that they took him up on his offer of further assistance in this case. Instead, prosecutors moved to introduce her video deposition at trial in lieu of providing her live testimony, claiming to the court that she was unavailable when, in fact, she was not unavailable to testify. At the time – How was she going to be available? They had tried. She's hiding out. That's what they're supposed to do. Well, I think it's sort of a misstatement to say that she was hiding out. Her former attorney was very clearly able to reach her, and he then provided prosecutors with enough information by which they probably could have attempted to find her, and in fact, in testimony. They went to the home they thought she was at at one point. Correct. So ERO, Enforcement Removal Operations, actually went to her uncle's house, which was the address that they believed her to be at in February, so on February 21st. So she was released on February 6th. The government agent found out on February 7th, and then on February 21st, Enforcement removed whomever was there and determined that she was not there. But between that time and April 12th, which was five days before trial, nothing was done to search for her. But even if you consider the efforts of the government five days before trial in reaching out to her former attorney to get in touch with her, they were provided with enough information in terms of the state that she was in, with whom she was residing, and – They were told she didn't have a telephone, right? Correct. But – And all they had was the boyfriend. She was in Delaware. Right. And this is in Miami, the trial, right? Yes. And she doesn't have – it's undisputed she didn't have a phone in this record. Correct. And they got the boyfriend's telephone number, right? Yes. And I thought the agent called the boyfriend, but it was inability to leave a voicemail message, and so he sent a text message saying, please contact me. Correct. And nobody contacted him. That is correct, per the record. But what the agent also said in his testimony when asked if he would have been able to run this man's information through whatever databases the government had, he responded, I guess I could have done that, but I didn't, in part because we had her video deposition already. What do we do with the fact that the government also sent a subpoena to the raven, the lawyer, and the lawyer said he would send it on to the boyfriend, because nobody's got her cell phone, so you agree everybody's got to communicate with her through the boyfriend. Right. Is that right? So the government does two things. One, they send a subpoena to the attorney, because that's the only way they do, and the attorney says, I've sent it on to the lawyer. Correct. Okay. Did Raven ever say the subpoena didn't get delivered or follow up and say the boyfriend wouldn't give it to her or anything like that? He did not. He indicated that he had forwarded the subpoena to her boyfriend, but the service... Who was supposed to be with her in Delaware and was the contact point. Correct. Okay. But it's the government's burden to ensure that a subpoena is properly served, and so Mr. Raven ended up giving the government enough information at least to run through a database to try and figure out a physical address for Ms. Vixima in Delaware through which they would have been able to potentially serve the subpoena directly on her, and I think that effort would be more in line with what the confrontation clause requires in terms of determining whether a witness is truly unavailable to testify at trial. What is the significance, if any, of the agent's statement that he guessed he could have done other things, but he didn't do them because he knew that her testimony had been preserved? I believe that that just demonstrates a misunderstanding of what the law requires the government to do in order to uphold its burden under the confrontation clause. The right to confront a witness, as you all know, is one of the most important rights for a defendant in a criminal trial, and while procedures exist to preserve a witness's testimony in case it may become necessary to use that testimony if the witness is unavailable, the government's number one requirement is to attempt to attain that material witness's live testimony at trial, regardless of whether they have video-recorded deposition of that testimony. The analysis really should go forward assuming that that video deposition doesn't even exist, and the court should ask itself, did the government do enough to obtain her presence at trial in order to testify before a jury and a judge? And so the agent in this case said, you know, I chose not to do this because I had her testimony no less than three times in this case, and there were multiple things that he could have done. They, you know, unlike a lot of the case law that the government cited to in their briefs, you know, this was a witness that was within the United States and subject to the subpoena power of this country and had enough snippets of information to run it in order to obtain her live presence at trial. And I see that my time is slowly running out. It's not yet done. And so, you know, our contention is that with the information they had as soon as February 21st, if not earlier, the trial date was set February 12th. The government, the prosecutors in the case who were trying this case knew as early as February 21st that this witness had not been deported and was still present in the United States. There was a number of steps that the government could have taken that they chose not to take. If she came back here, she would have been deported, though. If she came back to Miami. If she was brought to Miami. There was a deportation order, right? There was. She had tried to get a visa three times, couldn't get it. Correct. So she came without a visa, and there was a deportation order in effect, right? Right. And she was mistakenly released from custody before she was deported. Correct. And where was she in custody then? Well, so she was when she was under the material witness warrant. She was being held at the federal detention center here in Miami. Right. While deposed. She would have been available because she was right here, but ICE released her or somebody released her. Right. There was a misunderstanding, it seems like, from the record between ICE and enforcement removal and the agent on this case. But there was a deportation order in Miami outstanding. Right. But to your point, whether or not she would have actually been at trial is irrelevant to this analysis. I think I agree with you that they had the deposition. They still got to make an effort, no matter if they have the deposition or they don't have the deposition. So the question in the case is, did they do enough to make a good faith effort to obtain the witness? Right. And it's our contention that they did not. But I just think whether this effort, whether any more was realistic when you've got somebody who's clearly was in jail, mistakenly released, has no incentive to come back here, doesn't have a phone, you know, all these factors. It's whether in that situation, how much more they have to do than what they did. And I think the record clearly demonstrates through the testimony of the agent and the email exchange between the government and her former attorney that there was a number of things that they could have done that the agent himself was questioned about that he very cavalierly said, well, I just I didn't think I needed to do that because we had the video deposition of her testimony. And so regardless of whether she would have come here willingly or she had been deported, those are all questions that we will never know the answer to because her are in Delaware other than they're just in Delaware. No. So they know that she's in Delaware. They know her boyfriend's name and they know his phone number. Okay. And that's all they know. And do we know from the cell number that they are able to call the boyfriend, but the area code of that cell number is? Yes. So they have his phone number and they also know that her form. What is the area code on that cell number? I don't know it off the top of my head. Okay. So I don't know if it's a no, but her attorney was able, clearly able to talk to someone and also leave a message for someone. And not only that, he indicated that he had been able to get in touch with a family member of hers. And so the other issue is, you know, how the government started this search a little earlier or reached out to this attorney a little earlier. There were a number of options available to them in order to secure her presence. I have one other question related to what you've been talking about. Did the government, did any of the agents or anyone in the government ever express that it didn't do more because it believed that she wasn't going to return because she had no incentive to return because she was going to be deported? Well, I believe that at the motion hearing on this in the trial court, one of the arguments the government made was that she didn't want to be found. And so that was part of the reason why they argued. I guess my question is, did any of the people who, was there any testimony that the reason that there were no further measures undertaken that they thought that she wasn't going to return regardless because she had no incentive because she knew if she returned she would be deported? I don't believe so. So can we consider that? I don't believe so. It's not in the record. That would be an inference perhaps that you would draw from testimony, but there's no record evidence. As to that, the record evidence that we do have from the questioning of the agent is more in the line of what he chose not to do in reliance of the deposition that they already had in their possession. Thank you. I see that my time has run. Thank you. May it please the court. Good morning. My name is Albert Levin. I represent Renato Smith who's the appellant and I also represented Mr. Smith at the trial level. With regard to that last issue, I would just point out that the government realized that this witness had been released from FDC on or about February the 21st and did nothing to find her until April 5th. Her uncle lived in Broward County right up the road. I thought they went to the uncle's residence. They did. They went to the uncle's residence. The uncle let them search the house and she wasn't there. Yes. Judge Hall, my point being that they could have probably done a little bit of a follow-up after that search, perhaps had met with the uncle between February 21st and April 5th again. I don't want to take too much of my time on that I've adopted the brief of co-appellant and also her argument. I'm here primarily to discuss the issue raised in our brief with regard to the prosecutor's closing argument in rebuttal where after I had closed and indicated that the boat that was located in this case was found between Key Largo and Bimini. My client when he was arrested told the agents that they had been adrift for six days and they had ended up there that they were actually going from Freeport to Bimini. The prosecutor in his rebuttal closing argument stated quote so ladies and gentlemen to go down south away from where you're last caught it's not accident or mistake you're trying to get in undetected and he was responding to a comment I had made in my closing argument with regard to the shortest distance between two points being a straight line and I objected to that comment because there was nothing in the record as to where Mr. Smith and this came in the form of a 404b where the judgment of his previous conviction for the same offense was introduced indicating that he had pled guilty in the West Palm Beach division of the Southern District of Florida. It made no reference as to the fact or the matter regarding where he was quote unquote caught with regard to this issue so there was nothing in the record evidence to show that he in the previous conviction had been caught in West Palm Beach. Where was he caught? He was caught in Manalapan which is in Palm Beach County. It's a small town just to the south of Palm Beach but there was nothing in the record to discuss that he was in fact caught in Manalapan. All that the jury had to rely on was the fact that he was convicted in the West Palm Beach division of the Southern District of Florida. Would it have been helpful to your argument about routes if the jury had known he had been caught in Palm Beach County versus? No it would not have been helpful to my argument. It doesn't really matter. Well it does matter your honor because the rebuttal argument was that the reason he didn't go directly from Preport to Palm Beach County was because that was where he had been caught previously so he wanted to avoid going the same route because he'd been caught in that area before so he went further south which is ultimately where the boat ended up. The Coast Guard officers testified that there were a variety of factors that could have led them let them end up in that area beating the currents or a number of competing ocean currents that would cause them to be in that area as opposed to him trying to avoid detection by taking. My point though is if you think having been caught in Palm Beach County is an important fact and would have helped you that it was misleading for the jury to think he might have been caught in West Palm Beach you're telling me it wouldn't have helped them to know he had been caught in Palm Beach County. No from from my position I didn't want the jury to know that he'd been caught in Palm Beach County okay and there was nothing in the in the record here other than this conviction to show that he was convicted in a court in Palm Beach County which doesn't necessarily mean that the offense occurred in Palm Beach County. There are plenty of cases that are indicted in Fort Lauderdale that get assigned to judges in West Palm Beach. There are cases that get indicted in Miami that occurred in Miami that get indicted in West Palm Beach so for that matter the fact that he was convicted in the West Palm Beach court didn't necessarily mean that he had previously been caught in Palm Beach before as the prosecutor erroneously misled the jury by arguing in a rebuttal argument I might add where I did not have an opportunity to counter that counsel good morning it's I'm Lisa Hirsch on behalf of the United States seated with me at counsel table is Kurt Lunkenheimer who was one of the trial a usas in this matter as to the first issue the United States made a good faith effort to locate a witness who was brought to this country expressly for the purpose of being a witness in this case this witness was found on a boat offshore and the only reason she came to the United States was to be a witness in this in this case she had no prior history or prior address in the United States the government filed a material witness complaint and she was taken to FDC where she was deposed and at her deposition were the defense attorneys and the defendants after her deposition she was let me ask you a question I'm sorry to interrupt but do you want to address whether this would have been harmless error like just assume for purposes of our discussion that that there was a problem that the government didn't do everything it reasonably could have done you want to address the I will although I don't want to concede the first problem but I understand that in this case it was definitely harmless error given both the strength of the government's case as well as the fact that there were two witnesses who were deposed and that their testimony was very similar so unlike the situation in a case like Toronto, Toronto where the deposition was key evidence and the only evidence of something here there there there was all the circumstances around surrounding the boat the boat on which these migrants were found the testimony of various officers about the location of the boat and how the story that they were headed towards Bimini didn't make any sense because the drift would have been northward and not southward so that they were definitely too far south for their story to make sense the presence of all these migrants they were all Haitian migrants who had an extra set of clothes and no identification which one of the officers testified was somewhat typical of these situations the deposition the other deposition that was admitted into evidence where the testimony was that they were headed to the United States and so given all the circumstances of the evidence well I mean the other deposition it wasn't quite as clear wouldn't you agree that they were headed to the United States? I would say that the witness was led to say some things that he where there were he made somewhat conflicting statements on cross that he didn't know exactly where they're headed he wasn't driving but his testimony was that his parents had or his father wanted him to come to the United States and that's why he was on the boat to come to the United States. So was Miss Vixima a clear better witness? I would say yes she was but that this witness was also gave the same testimony about the fact that they got on this boat at night and that they were heading to the U.S. for a better life and given all the other evidence I do believe it's harmless there but I don't want to concede the first point because I think under the circumstances of what happened here and with somebody who was in the country it was subject to deportation with no prior address. Here's here's my problem with that you know if Agent Nowicki had said you know what I stopped looking for her because she had no incentive to show up she knew she would be deported if she came back here and she you know there was no way she was going to show up it would have been futile we did what we did but he didn't say that he said we I just didn't do anything further because we had the other we had the depo testimony and that to me is is a problem and let me tell you why so you can address it I mean you could always say that in any case where you have a material witness and you take the depo beforehand but that's not the test so I'm concerned that if we send a message that it's okay you know that that even though you know you could have reasonably done more and you don't do anything more that that's that that's okay I think that's a problem do you want to address that? Well he also testified and this is at page 73 of his testimony we didn't want her to be at liberty we were trying to find her but being unable to but he does say I mean does he not say three different times you know we had the deposition so we didn't worry about it and does he not also say yeah I could have I could have gone out myself but I gave it to ERO to to handle I could have done it myself I just I didn't do it I didn't you know I didn't as to the ERO I think that ERO's had the detainer on her and ERO was supposed to deport her and that was their role his role was the case agent and yes and that's my point right why didn't he do something as the case agent I mean I understand he thought that ERO was independently going to try to find her but ERO had a different purpose and you know when we're talking about the sixth amendment right to confrontation that's really not something ERO is going to be concerned about but it is something the government has to be concerned about correct and I do think Ohio versus Robert they talk about the efforts made by the prosecution versus the government as a whole so I would agree with you but the case agent on the 7th called the marshals to find out where she was and once he found out that she had been released before everybody thought she would be released because I think they thought they had 48 hours minus the the weekend which is in in the CFR regulation he immediately contacted the uncle gave the uncle his phone number so the uncle could reach out and contact him he immediately gave this the information to ERO and then they followed up they went out to the house ERO went into the house and found and were told that she wasn't living there so this the agent knew that he had followed up with what he could do because that the uncle was the only contact that the that the agent knew that she had in the United States it wasn't until um soon before trial when the boyfriend's uh information was provided by defense counsel when was defense counsel when was defense counsel appointed wasn't it before like wasn't it at her initial appearance and wasn't he present for her deposition it was for her deposition which all occurred well before I mean February right until January so why is it then that he had nothing else he could have done I mean he clearly the AUSA on the case was able to do something he could have contacted the AUSA if he didn't have you know I mean that probably would have been the way to do it contact the AUSA say look she's in the wind you know can you contact defense counsel and see if we can find her but that didn't happen I mean two months went by and it wasn't until five days before the trial it is in the record that the agent let the AUSA know on February 21st that ERO had been unable to locate her at the um at the uncle's house and so then efforts were made prior to trial to contact right but what happened between February 7th and five days before trial uh February 21st the agent said that he contacted ERO again to have them go out to the uncle's house again but they refused to go I mean it seems like at that point the agent had pretty much decided I'm not going to worry about this I don't know it's only because the AUSA decided I don't I don't believe the record that he was trying to do what he could but that prior to trial he didn't have the means to detain her because that's not what he says right I mean he doesn't say any of that I think this would be a different record if he said you know I wanted to go out and get her we did not have the manpower I couldn't receive authorization from my agency because I was assigned to these other cases we don't we don't have any of that here that's the problem all we have is him saying I called ERO they said they couldn't do it you know I probably could have done something but I didn't worry about it because I knew we had the deposition transcript I mean that that to me seems like it might be a problem I the district court that heard the testimony didn't feel that he felt that way but that he'd done what he could but he said he didn't I mean well I mean that he said that there were when he was after if he could have done this or that he was kind of like well yes so well and I do think the record shows she did not want to be found I mean the the boyfriend's telephone number which was provided had no voicemail text messages the agent called it twice text messages and there were no responses so I think the record suggests that she did not want to be found and agent Nowicki did say that she was subject to deportation and found so I think I'm looking at the agent's testimony the hearing he said and and they asked the agent uh is she facing deportation issues found by any law enforcement officers he said yes she is and that's an addition to her bench warrant and that's correct yes and did he then say so I stopped looking because of that uh I don't I don't have his testimony no he doesn't say that right there at that point in time but he's aware that she's if she comes back um she's going to be deported correct and I think the district court felt that way and felt that the and the voicemail hadn't been set up on the phone so he texts um and it seems like it comes down to you got a lawyer representing her right and so you try to go through the lawyer she's got no address and no phone so I guess the question is is it a good faith effort when they find the lawyer they send the subpoena to the lawyer the lawyer says yeah I can communicate with her the through the boyfriend and they do communicate the lawyer says yes I sent the subpoena to it to the boyfriend and you know he's in contact with her and is that a good faith enough that's really the question is that enough to show good faith attempt to locate this witness under the facts and circumstances here uh I I think what would be your best case for that I think Ohio versus Roberts where the address and contacted the closest family member and the court found that that was a good faith effort uh the court also stated something to the effect that might there be other things that could be done yes but that that wasn't the test for whether a good faith effort had been made uh in this case very unusual circumstances to have this witness I agree that the test isn't whether other things could have been done the test is whether reasonably other things could have been done would you agree that that's what the test is I I good faith and reasonable under the circumstances I agree and the agent had a witness who had had no known ties to the U.S. other than the uncle before before they found out about the boyfriend in in supposedly in Delaware I mean it was all they look at the information if we look at you know the case law from other circuits for example and obviously that's not binding or anything but I think it it gives us some some insight into what is meant by uh what is expected to be done the case law from other circuits talks about when the when the effort is made you know just a few days before even though you know the witness is in the wind two or three months before that's a problem I mean that's what the case law says and that's really what happened here I don't know if you want to well speak to that except that I I think you're speaking about Toronto Toronto and I I think that it's different in that um there had been efforts made to contact the uncle who was in the southern district and that ERO had gone out to the house and not found that she was there so I I think that differentiates that from here and that you know we have this illegal alien who's going to be deported if she's found well except that again no one from the prosecution does that I mean that's the deportation people doing that and they're out there for a whole different reason and I and this agent could not arrest this woman she was not subject to arrest or by the agent so it was limited as to what he could do practically I mean I don't even know how he's gonna find we don't know where she is to this day I assume no we don't but he would aren't and maybe defense counsel can answer this because she's saying there's things he should have done I'd like to know what they were but he happens on her and then I guess armed with a detainer he could then take her into custody well the detainers it gives the um it's for ERO yeah right well that's that's I wouldn't he wouldn't he just call you know ERO and have them come out and get her wrong yeah and he did he couldn't a federal agent he has no authority to detain her well he's a criminal agent and she had not done nothing criminally she had there's no but if there's a detainer that means that there's probable cause that she's here in violation of the law why why I mean it seems like you know we frequently have cases where people are just couldn't do it in this case that he could not he did not have the authority that ERO had the detainer on her and he did not have the authority to do anything else other than to try to get her to appear for trial um and she gives her deposition does she say where she's living at that time well she was at the Broward Transitional Center she was in jail then okay well jail she's at the transition center awaiting deportation which is a little different than jail when she's at FDC that's jail the transition center is not supposed to be quite as jail but she's not free to leave from there so that that's where she was at FDC at the time of the deposition prior to getting the material wasn't FDC or she was not she was at FDC and that prior to that she was being held at the Broward Transitional Center awaiting deportation uh as as to the um closing comment um I I believe that there was evidence in the record that both uh smugglers didn't always take the most direct route in order to avoid law enforcement detection and the conviction the prior conviction specifically said West Palm Beach on it and there was no error in um that comment uh there's nothing further I ask that you affirm the convictions thank you counsel so what I think differentiates this case from almost all of the case law that was cited to in the briefs is that here we have a witness who's physically present in the United States and subject to all of the investigative tools that the government has at its disposal not only to obtain unlawful immigrants but also witnesses who are material to a trial you're the agent what more tell me step by step the drives where he does what well so there is testimony in the record and he was asked about about this particular situation and he noted that there is an HSI office in Delaware to whom he could have reached out for assistance in at least determining an HSI homeland security investigations an office akin to his you know he's stationed here there's an office very similar what do they do they get in the car and they start driving where well no so so our argument is they have enough strings of information that they could have pulled at to at least try to determine a physical address for this boyfriend of hers and yeah then they could have potentially visited the home and because the trial date in this case was set so early it was set in February the trial subpoena could have been served at any point after that and additionally because she was unlawfully present in the United States that's technically a misdemeanor which is technically a crime and so there's many things that you know many tools that the government had at its disposal in order to secure her presence and bring her back they were also aware of who her attorney was at the material witness proceedings in January and chose to only reach out to him in April and so perhaps if they had brought him into the fold earlier you know he was never going to voluntarily come forward that would have been irrational correct she would have been deported well there's actually also no record evidence that she was even aware of the circumstances under which she was released I mean suppose when she was being detained not contacting people does it not reasonably suggest she knows it's better for her to be under the radar than above the radar well I'm sure you know it's hard to speculate as to what she was thinking because we have no idea her deposition in her mind had been taken and so I don't know that she believed she needed to reach out to anyone you know she wasn't here legally didn't she correct she knew that but like let me ask you a question in the southern district of Florida people who are arrested for being here illegally and are detained did they on occasion receive bonds from immigration that allow them to uh to go outside of the the detention center and be on their own on the on the understanding that they'll show up again for their hearing absolutely does that happen with some frequency down here all the time and you know often immigrants are paroled out for a variety of reasons there's many ways for an immigrant who's here unlawfully or otherwise to be to be released from custody I believe the the preference is to not hold an unlawful immigrant whose only crime was entering unlawfully in custody for the entire time of their stay here in the United States and so she could have I mean she could have believed a number of things but again the analysis is not like what she could have done better or what you know the defendants could have done better the burden in this case really does fall on the government and the same holds true for the harmlessness analysis because because this is a constitutional violation the the the standard is harmless beyond a reasonable doubt and we don't believe that the government has met its burden in this case her testimony was key as to the knowledge and intent to enter the United States element she was steadfast in her testimony about where she was headed she testified that she paid three thousand dollars to get to the Bahamas and that her family paid an additional five thousand dollars to come to the United States and in their second closing the government really hit hit the nail on the by stressing to the jury who pays five thousand dollars to go from Freeport to Bimini of course she was coming to the United States and her testimony was the only testimony that hit any part of payment or anything like that and so it really was the nail in the coffin if you will on all of the charges you contend her testimony was a key testimony in the whole case correct right and and and so help me with this um you've got a lawyer who does represent her is that correct Mr. Raven did represent her it's clear he represented her on the material witness complaint but it's unclear if he continued to represent her what but that's what they're trying to get her to appear at trial as a material witness correct okay so he he's certainly acting like he represents her right i think the let's say this from facts the district court could just think he was her lawyer i think the district court says that the district yes okay and as i understand the record he sends a subpoena to the boyfriend and based on the record the boyfriend says he can contact her that's how you have to get to her and so why is the district wrong in saying she knew there was a subpoena for her okay and she didn't come so why don't we take this record the government was successful in getting the subpoena to her for trial right per the emails it would seem so but right right so i'm trying to say does she have the subpoena or not isn't the overwhelming evidence here is that the boyfriend got the subpoena he acknowledged it he's communicating with the lawyer saying she didn't have a phone you know get it to me and i'll get it to her so she's got the subpoena for trial i'm trying to understand why that's not enough for good faith effort to get her here when they serve her with a subpoena you can debate whether or not i'm right about whether she was served and the record shows the government did enough to get a subpoena on her to come to trial i would disagree with that because we know okay i'll take for the sake of argument you just agreed that the government got a subpoena to her boyfriend well but the boyfriend has said send it to me and i'll get it to her okay so and y'all are saying if we just go find the boyfriend's address we can find her everybody's acknowledging she didn't have address you just said when you could they could have go tried to find the boyfriend's address so assume for sake of my argument they got a subpoena to her or at least that's what the record overwhelmingly indicates in the light okay of the evidence i hope to look at what the district court found when he ruled on this but so is serving a subpoena on somebody not good enough i don't think in this case when there was so much other information that the government had in their possession that could have led to proper service of the subpoena on her and a rendition of her from delaware to south florida to testify at this trial not all witnesses are always willing and desirous so the government's to show good faith effort to get the witness here they've got to do more than serve them with a subpoena i believe in this case given the other information and the other circumstances that were present yes what the government did here was thank you thank you counsel thank you we would ask that you reverse the convictions thank you and i would add to that that uh the the things that the government could have done and what a reasonably what they reasonably could have done would be to have contacted mr rabin in february when they realized that she'd been let out of custody and not wait until april to approaching this delaware issue her testimony was critical to prove that the intent of my client was to enter the united states when you bolster or couple that with the closing argument rebuttal closing argument which merely was that he had been convicted in west palm beach without any type of evidence that talks about the court procedure the jury was only left to conclude that he was in fact convicted in west palm beach but the inferences that it occurred there not necessarily so by this court's own policies and procedures with regard to the assignment of cases so the cumulative error is sufficient in my view to warrant my client receiving a new trial thank you thank you counsel